IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

DOMINO'S PIZZA, LLC,

      Appellant/Cross-Appellee,

v.

                                                  Case No.  5D16-2794

YVONNE WIEDERHOLD, AS PERSONAL
REPRESENTATIVE OF THE ESTATE OF
RICHARD E. WIEDERHOLD,

      Appellee/Cross-Appellant.

_____/

Opinion filed May 11, 2018

Appeal from the Circuit Court
for Orange County,
Janet C. Thorpe, Judge.

Dinah S. Stein and Mark Hicks, of Hicks,
Porter, Ebenfeld & Stein, P.A., Miami, and
Richard S. Womble and Christine V.
Zharova, of Rissman, Barrett, Hurt,
Donahue & McLain, P.A., Orlando, for
Appellant/Cross Appellee.

John S. Mills and Courtney Brewer, of The
Mills Firm, P.A., Tallahassee, for
Appellee/Cross Appellant.

ORFINGER, J.

      Domino's Pizza, LLC,[1] appeals a final judgment entered in favor of Yvonne

Wiederhold, as personal representative of the estate of Richard E. Wiederhold.  Domino's

---

      [1] This opinion will use the term "Domino's" when referring to the appellant's name
in both its regular and possessive forms, as most cases do.  See, e.g., Font v. Stanley

argues that the trial court should have granted directed verdicts on Mrs. Wiederhold's claim as a surviving spouse under the Wrongful Death Act, sections 768.16-.26, Florida Statutes (2012) (the "Act"), because she was not married to Mr. Wiederhold at the time of his injury; and that as a matter of law, it was not vicariously liable for the actions of its franchisee, Fischler Enterprises of C.F., Inc., because it did not control Fischler's day-to-day operations. Domino's also seeks a new trial based on Mrs. Wiederhold's improper closing arguments, which it claims denigrated its defense, referenced facts not in evidence, mischaracterized the law, and expressed counsel's personal beliefs or evoked the "golden rule." Mrs. Wiederhold cross-appeals, arguing that the trial court erred by denying her request for an award of Mr. Wiederhold's medical expenses paid by Medicare and insurance.

For the reasons set forth below, we affirm the denial of the directed verdicts on the issues of Mrs. Wiederhold's status as a "surviving spouse" and on Domino's vicarious liability. However, we reverse and remand for a new trial on liability and damages based on Mrs. Wiederhold's improper closing argument.[2] We also find merit in Mrs. Wiederhold's cross-appeal claim. On retrial, all medical expenses paid by or on Mr. Wiederhold's behalf should be considered by the jury.

---

Steemer Int'l, Inc., 849 So. 2d 1214, 1218 (Fla. 5th DCA 2003) ("The Domino's franchise agreement . . . mandated the use of Domino's bookkeeping requirements . . . ."); Parker v. Domino's Pizza, Inc., 629 So. 2d 1026, 1027 (Fla. 4th DCA 1993) ("This position was supported by an affidavit of Domino's National Director of Franchise Services.").

[2] Domino's remaining issues are either moot or without merit.

## FACTS AND PROCEDURAL BACKGROUND

In January 2011, Richard Wiederhold swerved into the median to avoid a vehicle that had pulled out in front of him. His vehicle drifted through the median and back across the roadway, flipped over once or twice, and came to rest in a ditch. The collision immediately rendered him a quadriplegic. The other vehicle was driven by Jeffrey Kidd, who was delivering pizza for Domino's franchisee, Fischler. One month after the accident, Mr. Wiederhold sued Domino's, Fischler, and Mr. Kidd, claiming that Mr. Kidd negligently caused his injuries and that Fischler and Domino's were vicariously liable. Several months later, Mr. Wiederhold married his girlfriend, who was an uninjured passenger in the accident. In March 2012, Mr. Wiederhold died, and his now-wife, Mrs. Wiederhold, as personal representative of his estate, was substituted as the plaintiff. She then filed an amended complaint to include a claim for wrongful death damages as Mr. Wiederhold's surviving spouse. In June 2013, Fischler was dismissed from the lawsuit after it settled with Mrs. Wiederhold for $1 million. That same month, the trial court allowed the attorneys representing Fischler and Mr. Kidd to withdraw from representing Mr. Kidd due to alleged irreconcilable differences. Mr. Kidd represented himself from that point forward, including at trial.

Prior to trial, Domino's filed several motions for summary judgment, which argued, among other things, that Mrs. Wiederhold was not a surviving spouse under the Act because the Wiederholds were not married at the time of the injury, it was not vicariously liable because it did not exercise control over Fischler's day-to-day operations, and all but one claim for medical and hospital expenses were barred because no claims had been filed in Mr. Wiederhold's probate proceeding. The court denied Domino's motions that

3

challenged Mrs. Wiederhold's status as a surviving spouse under the Act and Domino's vicarious liability. However, the trial court granted Domino's motion that Mrs. Wiederhold could only recover $1165.67 for medical expenses that were claimed in the probate proceedings. At the jury trial, Domino's renewed its motion for summary judgment on the vicarious liability issue and moved for directed verdict on the surviving spouse issue. The court denied both motions.

Ultimately, the jury rendered a verdict against Domino's, finding that: (1) Fischler was an agent of Domino's at the time of the crash; (2) Mr. Kidd's negligence was ninety percent of the legal cause of Mr. Wiederhold's injury and death; (3) total expenses incurred for home renovations to accommodate Mr. Wiederhold's injuries were $114,660;[3] and (4) Mrs. Wiederhold's damages for "loss of her husband's companionship and protection and for her mental pain and suffering as a result of [Mr. Wiederhold's] injury and death" totaled $10 million.

Domino's filed a timely renewed motion for directed verdict, judgment notwithstanding the verdict, or alternative motion for new trial or new trial on damages, renewing its earlier arguments, and additionally arguing that certain objected-to and unobjected-to comments made by Mrs. Wiederhold's counsel in closing argument warranted a new trial. Specifically, Domino's sought a new trial based on Mrs. Wiederhold's closing arguments, many of which were related to her theme that Domino's business model and its defense of this case was a "greedy charade" designed to control the activities of its franchisees to maximize profits, while contending that it lacked sufficient control of its franchisee's activities to avoid vicarious liability. The trial court

---

[3] Domino's does not challenge this award.

4

denied Domino's motions and entered a final judgment against Domino's for ninety percent of the verdict amount, less the $1 million setoff for the Fischler settlement, for a total judgment of $8,103,194 in favor of Mrs. Wiederhold and the estate.[4] This appeal and cross-appeal follow.

**ANALYSIS**

**On Direct Appeal**

***A.     Is Mrs. Wiederhold a Statutory Survivor?***

Domino's first argues that one's status as a survivor is determined on the date of injury, and thus, we must reverse the wrongful death award to Mrs. Wiederhold because she is not a survivor under the Act.

This is a matter of statutory construction subject to de novo review. Citizens Prop. Ins. Corp. v. Perdido Sun Condo. Ass'n, 164 So. 3d 663, 666 (Fla. 2015). "The starting point of statutory interpretation is the language of the statute itself." Herrin v. City of Deltona, 121 So. 3d 1094, 1097 (Fla. 5th DCA 2013) (citing GTC, Inc. v. Edgar, 967 So. 2d 781, 785 (Fla. 2007)). "If statutory language is clear and unambiguous, 'there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning.'" Id. (quoting A. R. Douglass, Inc. v. McRainey, 137 So. 157, 159 (Fla. 1931)). "However, if a statutory provision is ambiguous, courts may employ rules of construction and extrinsic aids to discern legislative intent." Id. (citing Holly v. Auld, 450 So. 2d 217, 219 (Fla. 1984)).

---

[4] The judgment was entered only against Domino's because an automatic stay was imposed in Mr. Kidd's post-verdict bankruptcy case.

A wrongful death action must "be brought by the decedent's personal representative, who shall recover for the benefit of the decedent's survivors and estate all damages, as specified in this act, caused by the injury resulting in death." § 768.20, Fla. Stat. (2012). The Act defines "survivors" as "the decedent's spouse, children, parents, and, when partly or wholly dependent on the decedent for support or services, any blood relatives and adoptive brothers and sisters." Id. § 768.18(1). Where the legislature has defined a term, courts are bound to follow that definition. Streeter v. Sullivan, 509 So. 2d 268, 272 (Fla. 1987). Section 768.21 specifies the types of damages that may be awarded to "each survivor" and additional types of damages for certain survivors, including a "surviving spouse." It states, in pertinent part:

> All potential beneficiaries of a recovery for wrongful death, including the decedent's estate, shall be identified in the complaint, and their relationships to the decedent shall be alleged. Damages may be awarded as follows:
>
> (1) **Each survivor may recover** the value of lost support and services **from the date of the decedent's injury** to her or his death, with interest, and **future loss of support and services from the date of death** and reduced to present value. In evaluating loss of support and services, the survivor's relationship to the decedent, the amount of the decedent's probable net income available for distribution to the particular survivor, and the replacement value of the decedent's services to the survivor may be considered. In computing the duration of future losses, the joint life expectancies of the survivor and the decedent and the period of minority, in the case of healthy minor children, may be considered.
>
> (2) **The surviving spouse may also recover** for loss of the decedent's companionship and protection and for mental pain and suffering **from the date of injury**.
>
> . . . .
>
> (5) Medical or funeral expenses due to the decedent's injury or death may be recovered by a **survivor** who has paid them.

6

§ 768.21(1), (2), (5), Fla. Stat. (2012) (emphasis added). However, while the statute defines **who** survivors are, it does not answer the question presented in this case of **when** their status as a survivor is determined.

Although the Act does not specify whether a "surviving spouse" must be married at the time of injury or the time of death, that alone does not render the term unclear or ambiguous if the common and ordinary meaning leads to clear and unambiguous results. Univ. of Fla. Bd. of Trs. v. Andrew, 961 So. 2d 375, 376 (Fla. 1st DCA 2007); see State v. Nichols, 892 So. 2d 1221, 1227 (Fla. 1st DCA 2005) (holding failure of statute to define term does not necessarily render statute ambiguous). The common and ordinary meaning of the term "survivor" is "esp. a person remaining alive after an event in which others have died." Survivor, The Oxford American College Dictionary (2002 ed.). Black's Law Dictionary defines "survivor" even more succinctly as "[o]ne who outlives another." Survivor, Black's Law Dictionary (9th ed. 2009). By extension, the common and ordinary meaning of a "surviving spouse" is a married person who outlives his or her husband or wife. Consequently, applying the plain meaning of these terms, we conclude the term "surviving spouse" is necessarily determined on the date of the other spouse's death because one cannot be a survivor before that date. Accord King v. Font Corp., 612 So. 2d 662, 664 (Fla. 2d DCA 1993) ("[I]t seems clear that the definition of 'survivors' in section 768.18, Florida Statutes (Supp. 1990), determines survivorship at the moment of the wrongful death."); see Snyder v. Alamo Rent-A-Car, Inc., 790 So. 2d 1262, 1262 (Fla. 5th DCA 2001) (Sharp, J., concurring specially) (noting that this Court's affirmance was based on King); Thomas D. Sawaya, 6 Fla. Prac., Personal Injury & Wrongful Death

Actions § 20:1 (2017-18 ed.) ("The definition of survivor in this statute determines survivorship at the time of the decedent's death." (citing King, 612 So. 2d at 664)).

This conclusion is consistent with cases recognizing that wrongful death actions accrue on the date of the decedent's death. See, e.g., Love v. Hannah, 72 So. 2d 39, 41 (Fla. 1954) ("The plaintiffs' right of action under the wrongful death statute must be determined by the facts existing at the time of the death of decedent."); Phlieger v. Nissan Motor Co., 487 So. 2d 1096, 1098 (Fla. 5th DCA 1986) (reiterating that supreme court held, in Love, that plaintiff's right of action under wrongful death statute must be determined by facts existing at time of decedent's death); Bruce v. Byer, 423 So. 2d 413, 414-15 (Fla. 5th DCA 1982) ("The general rule is that a cause of action for wrongful death accrues upon the date of the decedent's death.").

We recognize that our conclusion conflicts with Kelly v. Georgia-Pacific, LLC, 211 So. 3d 340 (Fla. 4th DCA), review denied, No. SC17-714 (Fla. Oct. 23, 2017). In Kelly, the majority concluded that

> the plain language of the Wrongful Death Act indicates that the legislature did not intend for a surviving spouse to recover consortium damages if the surviving spouse was not married to the decedent prior to the date of the decedent's injury. The definition of "survivor" in the statute is limited to familial relationships only, and both subsections (1) and (2) of section 768.21 clearly provide that damages are recoverable from the date of "injury." §§ 768.18(1), 768.21(1)–(2), Fla. Stat. (2015). Thus, the plain language of the statute indicates that the legislature anticipated that the surviving spouse would have been married to the decedent prior to the date of injury.

Id. at 345.

We agree that although the definition of "survivors" is limited to familial relationships, nothing in that definition limits those terms to familial relationships **existing at the time of injury**. As the Kelly dissent observed, "The statute defines 'survivors' as

8

including 'the decedent's spouse' without any other limitation." Id. at 348 (Taylor, J., dissenting).  Thus, "[i]t would be inappropriate for this Court to read any more into [the statutory definition] than what is plainly there." Streeter, 509 So. 2d at 272.  "Even where a court is convinced that the legislature really meant and intended something not expressed in the phraseology of the act, it will not deem itself authorized to depart from the plain meaning of the language which is free from ambiguity." Forsythe v. Longboat Key Beach Erosion Control Dist., 604 So. 2d 452, 454 (Fla. 1992) (quoting Van Pelt v. Hilliard, 78 So. 693, 694 (Fla. 1918)).

Moreover, if, as posited by the Kelly majority, survivorship is determined at the time of injury, then children born or adopted by the decedent after the date of injury would not be considered survivors.  Likewise, a spouse who divorces a decedent after the date of injury would be considered a survivor.  This would be contrary to established precedent holding that such determinations are made at the time of the decedent's death. See, e.g., Powell v. Gessner, 231 So. 2d 50, 51 (Fla. 4th DCA) ("[T]he status of a child in respect to its right to sue for the wrongful death of a parent is determined at the time of the death of the parent."), opinion adopted, 238 So. 2d 101 (Fla. 1970).  It also would be contrary to the legislative intent expressed in section 768.17, Florida Statutes (2012), which states, "It is the public policy of the state to shift the losses resulting when wrongful death occurs from the survivors of the decedent to the wrongdoer.  Sections 768.16-768.26 are remedial and shall be liberally construed." See also Wagner, Vaughan, McLaughlin & Brennan, P.A. v. Kennedy Law Grp., 64 So. 3d 1187, 1191 (Fla. 2011) (noting that Act is "designed to substitute the financial resources of the wrongdoer for the resources of the decedent, in an attempt to meet the financial obligations of the decedent, . . . and to

9

prevent a tortfeasor from evading liability for his or her misconduct when such misconduct results in death").

The Kelly majority's reliance on the Act's damage provisions to limit the definition of survivors is unconvincing. It concluded that the phrase "from the date of injury," repeatedly used in the damages section, "indicates that the legislature anticipated that the surviving spouse would have been married to the decedent prior to the date of injury." 211 So. 3d at 345. While it is appropriate to read all sections of the Act together to determine the meaning of its terms, see, e.g., BellSouth Telecommunications, Inc. v. Meeks, 863 So. 2d 287, 290 (Fla. 2003) ("To ascertain the meaning of a specific statutory section, the section should be read in the context of its surrounding sections."), we agree with the Kelly dissent that the damages provisions do not limit **who** may recover, but rather, only limits **what** a survivor may recover. See Kelly, 211 So. 3d at 349 (Taylor, J., dissenting). In fact, the legislature's frequent differentiation between the "date of injury" and the "date of death" in section 768.21 demonstrates its awareness that these may be two different dates in a given case. Given this recognition, it is illogical to conclude that the legislature would not also have recognized that a decedent's legal relationships and obligations may change between the date of injury and date of death. Yet, the Kelly majority's conclusion limits such relationships and obligations to those present on the date of injury. If the legislature intended to limit survivors to those existing on the date of injury, it could have done so. Cf. § 440.16, Fla. Stat. (2014) ("Relationship to the deceased giving right to compensation under the provisions of this section must have existed at the time of the accident, save only in the case of afterborn children of the deceased.").

Even if such a limitation is read into the statute based on the damages language, it would, at best, create an ambiguity as to whether survivors are determined on the date of injury or the date of death. And, as we have already noted, the legislature has instructed that the Act is to be liberally construed to achieve its purposes. Cf. Ellis v. Humana of Fla., Inc., 569 So. 2d 827, 829 (Fla. 5th DCA 1990) (construing Act liberally to hold that "a posthumous child is a 'survivor' of its father (or mother if the child survives the death of the mother) under the Florida Wrongful Death Act").

Finally, as the Kelly dissent noted, virtually every out-of-state case to address this issue has held that a spouse is not required to be married at the time of injury to pursue a statutory wrongful death claim. See, e.g., Lovett v. Garvin, 208 S.E.2d 838, 840 (Ga. 1974) ("Nothing in the language of this statute states or implies that the husband must be married to the wife at the time the injuries from which she subsequently dies are inflicted. Therefore, we agree that the right of action accrues at the time of the death of the wife."); Corley v. State, Dep't of Health & Hosp., 749 So. 2d 926 (La. Ct. App. 1999) (affirming judgment for "surviving spouse," who was not married to decedent at injurious treatment, based on clear terms of wrongful death act); Radley v. Le Ray Paper Co., 108 N.E. 86, 87 (N.Y. 1915) (affirming judgment for decedent's wife under wrongful death act as she was married to decedent when he died; it was "immaterial" that they were not married when decedent was injured); Du Bois v. Cmty. Hosp. of Schoharie Cty., Inc., 540 N.Y.S.2d 917, 918 (N.Y. App. Div. 1989) (following Radley and stating that "widow's rights as a distributee or beneficiary of the decedent are not affected by when the marriage occurred as long as the parties were married at the time of the decedent's death"); DeVine v. Blanchard Valley Med. Assocs., 725 N.E.2d 366, 369 (Ohio Ct. Comm. Pleas 1999)

11

(rejecting application of marriage at time of injury rule to Ohio wrongful death statute because statute was exception to common law and provided more damages than consortium claim); Gross v. Elec. Traction Co., 36 A. 424 (Pa. 1897) (affirming wrongful death judgment in favor of decedent's widow despite not being married to him at time of injury because she was his wife at time of death); see also Walsh v. Armstrong World Indus., Inc., 700 F. Supp. 783 (S.D.N.Y. 1988) (following Radley and rejecting argument that spouse was marrying into claim). Although the Kelly majority distinguished these cases because they did not interpret the Act or Florida common law, they are nevertheless persuasive because many of them interpret similar language and hold that the plain language of such statutes allows such claims.

For these reasons, we affirm the trial court's ruling allowing Mrs. Wiederhold to recover as a surviving spouse. We certify express and direct conflict with Kelly on this issue.

**B.     Is Domino's Vicariously Liable for An Automobile Accident Involving Its Franchisee?**

Under Florida law, vicarious liability may arise in various ways. Of relevance here, a franchisor may be held vicariously liable under an agency theory for the tortious acts of a franchisee, or a franchisee's employee, when the franchisor has direct control of, or the right to control, the day-to-day operations of the franchisee. See Mobil Oil Corp. v. Bransford, 648 So. 2d 119, 120 (Fla. 1995) (explaining that franchisor creates "agency relationship with a franchisee if, by contract or action or representation, the franchisor has directly or apparently participated in some substantial way in directing or managing acts of the franchisee"); Hickman v. Barclay's Int'l Realty, Inc., 5 So. 3d 804, 806 (Fla. 4th DCA 2009) (explaining it is right of control, not actual control or descriptive labels employed by

12

parties, that determines agency relationship); see also Goldschmidt v. Holman, 571 So. 2d 422, 424 n.5 (Fla. 1990) (explaining that actual agency relationship requires "(1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent"). Applying the "control" test to a franchise is not an easy undertaking because franchises have independent aspects to them, but they must also retain some control over the use of their names, goods and services. Font v. Stanley Steemer Int'l, Inc., 849 So. 2d 1214, 1216 (Fla. 5th DCA 2003). Whether the franchisor's control is sufficient to establish an agency relationship "depends in each case upon the nature and extent of such control as defined in the agreement or by the actual practice of the parties." Id. at 1216-17.

Here, Domino's contends that as a matter of law, it was not vicariously liable for the automobile accident because it had no control over Fischler's day-to-day operations. Domino's asserts that the only evidence of control amounted to nothing more than "brand maintenance requirements and activities."[5] See, e.g., Bransford, 648 So. 2d at 120-21 (upholding summary judgment where record did not establish that franchisor had "directly or apparently participated in some substantial way in directing or managing acts of the franchisee, beyond the mere fact of providing contractual franchise support activities").

The existence of an agency relationship is ordinarily a question for the trier of fact to decide. Villazon v. Prudential Health Care Plan, Inc., 843 So. 2d 842, 853 (Fla. 2003). However, a court may determine the absence of an agency relationship as a matter of law when the evidence is capable of but one determination and there is no evidentiary question for the jury to resolve. Font, 849 So. 2d at 1216. While Domino's points to

_____

[5] Domino's did not request a jury instruction on brand maintenance activities.

13

evidence supporting its position that it had no control over Fischler, it ignores abundant evidence of control to the contrary. Domino's argument is simply an invitation for this Court to reweigh the evidence or recharacterize its control as being limited to brand maintenance activities. We decline that invitation. The trial court properly determined that this issue was a question of fact for the jury to resolve.

**C.** **Is Domino's Entitled to a New Trial on Liability and Damages Based on Mrs. Wiederhold's Improper Closing Arguments?**

We review for an abuse of discretion a trial court's denial of a motion for new trial based on improper closing arguments. Engle v. Liggett Grp., Inc., 945 So. 2d 1246, 1271 (Fla. 2006). We apply different standards to a ruling on a motion for new trial based on improper closing arguments depending on whether the comments challenged as improper are preserved or unpreserved. For preserved comments, "the trial court should grant a new trial if the argument was 'so highly prejudicial and inflammatory that it denied the opposing party its right to a fair trial.'" Id. (quoting Tanner v. Beck, 907 So. 2d 1190, 1196 (Fla. 3d DCA 2005)). For unpreserved comments, a new trial should be granted if the comments are improper, harmful, incurable, and damage the fairness of the trial such that the public interest requires a new trial. Murphy v. Int'l Robotic Sys., Inc., 766 So. 2d 1010, 1027-31 (Fla. 2000). We do not review each of the allegedly improper comments in isolation; instead, we examine the entire closing argument while paying specific attention to both the objected-to and the unobjected-to arguments in order to determine whether the cumulative effect of any impropriety deprived the objecting party of a fair trial. E.g., Braddy v. State, 111 So. 3d 810, 837 (Fla. 2012); Card v. State, 803 So. 2d 613, 622 (Fla. 2001).

14

### 1. *"Greedy Charade" Comments.*

Domino's contends that this Court should grant a new trial based on the comments of Mrs. Wiederhold's attorney that its agency defense was a "greedy charade." In the first instance, without objection, Mrs. Wiederhold's attorney stated that Domino's had employed a "greedy charade" when it inserted exculpatory language into its franchise agreement with Fischler while controlling every aspect of the Fischler franchise:

> Now, there's a disconnect here, because on the one hand you hear Mr. Devereaux say there's no right of control and then you see these documents that indicate overwhelming control of Mr. Fischler. Domino's would like for you to do nothing more than to disregard the realities, the realities, the evidence that you heard in this case and look to their documents that say things like: You are not an independent contractor. Well, labels, gentlemen, they don't work here. Labels don't control because if labels did control any of us, it could hire someone, control them, have them do what we want to and not call them an agent or an employee, we'd call them an independent contractor. They don't let people do that. That label doesn't work, that dog is not going to hunt. You can put it in there. You can say we're not principals and agent, but you are. And you have to question in your mind as you listen to the evidence do they put that in there to avoid the risk that they don't want to have while they enjoy the benefit of profit and they have the control. Of course, they do. This is a -- **I want to use the phrase "greedy charade," and they know it.** A charade comes in two forms, one of which we're talking about right now. And it's whether they are -- whether they have a right of control. We all know it now. You saw it by -- Mr. Devereaux testified. You get to evaluate his testimony and evaluate him as a witness.

(Emphasis added).

In the second instance, occurring immediately thereafter, Mrs. Wiederhold's attorney argued that Domino's "abandonment" of Mr. Kidd at trial was further evidence of its "greedy charade." Domino's objected on the ground that it was not accurate to claim that it had the responsibility to defend Mr. Kidd. The trial court agreed and informed the jury to disregard the last statement made by Mrs. Wiederhold's attorney:

15

I don't think I need to talk about that anymore other than to say that Domino's, Mr. Devereaux, the whole team up in Ann Arbor, Michigan. And Mr. Fischler and Mr. Kidd are out there making pizza to their specifications in the stores, with store specifications, delivered by a team member like Jeffrey Kidd. They are a huge -- they are a huge cheerleader for those moneymakers. **But let that agent or its employee act negligent for a brief moment, fail to use reasonable care and cause a tragedy and they'll abandon that team member. Leave him sitting at the table by himself.**

[DOMINO'S COUNSEL]: Judge, excuse me. May we approach?

(The following Bench Conference took place outside the hearing of the jury.)

[DOMINO'S COUNSEL]: **Judge, we strongly object** to the statement that's just been made. **This man is not the employee of Domino's. We did not abandon him. He had his own insurance company. He had his own insurance policy. He was employed and covered by the insurance company for the franchisee. They chose to withdraw his defense when they decided to settle the case. To say that's our responsibility is highly improper and I move for a mistrial.**

[WIEDERHOLD'S COUNSEL]: It's not grounds for a mistrial, Your Honor. That's exactly what they have done. They control Mr. Fischler. They control the drivers and when it comes time to be in this courtroom they won't have nothing to do with that risk. It's exactly what they've done, and it's a very fair comment.

THE COURT: Well, first of all, you're not getting a mistrial.

**Second of all, you settled with Fischler. You cannot use that settlement to make the situation into your advantage. So either I'm going to tell them to disregard the last sentence or you are going to correct it.**

[WIEDERHOLD'S COUNSEL]: I'll let Your Honor do it.

THE COURT: Okay. Thank you.

(The Bench Conference ended.)

THE COURT: **Jurors, the last statement that was made by plaintiff's counsel was inaccurate and you shall disregard it**.

16

[WIEDERHOLD'S COUNSEL]: But when something like this happens, something tragic, Domino's wants nothing to do with the risk. We don't permit that under our law. . . .

(Emphasis added).

The third instance occurred when Mrs. Wiederhold's attorney argued that Domino's attempted use of a portion of the investigating officer's, Trooper O'Quinn, deposition testimony was part of its "greedy charade" to mislead the jury. In his closing argument, Domino's counsel argued that expert accident reconstruction analysis showed that Mr. Wiederhold would have been able to avoid colliding with Mr. Kidd if he had simply braked instead of swerved. He then stated, "Trooper O'Quinn testified via videotape, and he said that Mr. Wiederhold told him that he just swerved left. So was there a braking by Mr. Wiederhold before he entered the median?" Mrs. Wiederhold's attorney responded in rebuttal:

> With all due respect to my friend for the defense, you remember Mr. Womble just stood up here and told you that Trooper O'Quinn told you that Mr. Wiederhold said I just swerved left. That was all he said. That's all that Mr. Womble said. Do you remember that? This is part of the **greedy charade** because that's not all that Trooper O'Quinn testified about. Trooper O'Quinn was asked were you able to get any information from him that was helpful to you in the crash investigation referring to Mr. Wiederhold and Trooper O'Quinn testified in this courtroom, "He advised me that a vehicle had turned out in front of him. He really couldn't give -- he gave me a vague description. He says a lighter color two-door vehicle with Domino's delivery sign on the roof." **It's part of the greedy charade to stand up and deny that which you know to be true. That they had a right of control.**

(Emphasis added). Domino's simply objected to this comment as "repetition of 'greedy charade'" without further explanation. It later moved for a mistrial on this comment based on the use of testimony not in evidence.

17

The fourth instance occurred after Mrs. Wiederhold's attorney, without objection, referred to Domino's agency defense and the money it spent on its accident reconstruction animation as another example of its "greedy charade":

> **You tell them what you think about the charade, about the agency and right of control and the $40,000 they spent to come up with that animation.** And she from the very beginning has said, "Somebody pulled out in front," and so did Mr. Kidd. **You see that justice is done and tell them what you think about their verdict.**

(Emphasis added).

We agree that Mrs. Wiederhold's first "greedy charade" comment improperly denigrated Domino's defense. See Allstate Ins. Co. v. Marotta, 125 So. 3d 956, 960 (Fla. 4th DCA 2013) (stating improper to suggest that defending claim in court is improper or that defendant should be punished for contesting damages); Fasani v. Kowalski, 43 So. 3d 805, 809 (Fla. 3d DCA 2010) ("The law is clear that it is improper for an attorney to disparage an opposing party's defense of a case or to suggest that a party should be punished for contesting a claim."). The third "greedy charade" comment argued facts not in evidence. See Shoaf v. Geiling, 960 So. 2d 41, 43 (Fla. 5th DCA 2007) (stating prejudicial error to play portion of deposition not in evidence during closing argument). The fourth "greedy charade" comment, urging the jury to "tell [Domino's] what you think" about its agency and comparative negligence defenses, was an improper "send a message argument." See, e.g., City of Orlando v. Pineiro, 66 So. 3d 1064, 1070 (Fla. 5th DCA 2011) (finding comment that money verdict would help to tell decedent's parents jury recognized wrong was done was improper "send-a-message" argument); Kloster Cruise Ltd. v. Grubbs, 762 So. 2d 552, 554 (Fla. 3d DCA 2000) (finding comment that jury should "tell them [Norwegian] by your verdict in this case to do something about this"

18

was improper "send a message" argument). However, while these comments were improper, Domino's either did not object or objected on other grounds.

With respect to Mrs. Wiederhold's second "greedy charade" comment, which was preserved, we agree that Mrs. Wiederhold's argument that Domino's abandoned Mr. Kidd at trial was false and highly prejudicial, even with the trial court's curative instruction. The comment was inflammatory for two reasons. First, Mrs. Wiederhold's counsel tied it to his "greedy charade" attack on Domino's defense. Second, the jury was told that Mr. Kidd was representing himself; saw Domino's corporate representative sitting at one table with Domino's lawyers and Mr. Kidd sitting at a separate table by himself; and watched Mr. Kidd's feeble attempts to participate in the trial.

While the trial court correctly recognized that the argument was false because Fischler (or its insurance carrier), not Domino's, had abandoned Mr. Kidd and informed Mrs. Wiederhold that she could not use that settlement to her advantage, its attempted curative instruction—that "the last statement that was made by plaintiff's counsel was inaccurate and you shall disregard it"—was not adequate. This instruction failed to identify the improper statement and failed to explain why the statement was improper. In short, the instruction was inadequate to counteract the prejudicial effect of the statement, especially in light of counsel's other references to Domino's defense as a part of its "greedy charade." See, e.g., R.J. Reynolds Tobacco Co. v. Calloway, 201 So. 3d 753, 764 (Fla. 4th DCA 2016) ("It also goes without saying that curative instructions do not always remedy the damage done by improper argument, and whether such an instruction was sufficient to do so is decided according to the facts, on a case-by-case basis."); Parkansky v. Old Key Largo, Inc., 546 So. 2d 1143, 1145 (Fla. 3d DCA 1989) ("A new

19

trial is warranted when an improper comment is likely to result in substantial prejudice to the complaining party . . . and where the improper suggestion is of such character that a curative instruction is insufficient 'to destroy [its] sinister influence.'"); Fayden v. Guerrero, 474 So. 2d 320, 321 (Fla. 3d DCA 1985) (upholding new trial on damages based on trial court finding improper argument that defendants should not have defended action, but should have given plaintiff $6 million; curative instruction to disregard comment likely failed to vitiate prejudice). As this improper argument was properly preserved by objection and motion for mistrial, a new trial would be warranted if the argument was "so highly prejudicial and inflammatory" that it denied Domino's its right to a fair trial.[6] Engle, 945 So. 2d at 1271.

### 2. *"No More" than $10 Million Comment.*

Domino's also complains that we should reverse on damages based on the following comment made by Mrs. Wiederhold's counsel because it mischaracterized the law and suggested that the figure had the imprimatur of the court:

> And I'm going to suggest to you that in order to make this right, to right this wrong, you will need to move a sum of money from their side of the courtroom to Yvonne Wiederhold's side of the courtroom to pay for what they've taken from her. **I'm going to suggest to you that sum is ten million dollars. Now, no more than that. No more than that because it might not be able to be upheld in post-trial motions. We don't want that. But up to that, all will be okay.** You're the ones that are going to decide.
>
> [DOMINO'S COUNSEL]: Judge, I'm sorry. May we approach?
>
> (The following Bench Conference took place outside the hearing of the jury.)

---

[6] The more stringent harmless error test announced in Special v. West Boca Medical Center, 160 So. 3d 1251 (Fla. 2014), does not apply here because the trial court sustained the objection and gave a curative instruction. R.J. Reynolds Tobacco Co. v. Robinson, 216 So. 3d 674, 683 (Fla. 1st DCA 2017).

20

[DOMINO'S COUNSEL]: **I object to the discussion with the jury that anything more than ten million dollars would be perhaps not upheld after the verdict. It's a backdoor way of suggesting that ten million dollars is an acceptable sum. And he's not entitled to tell them that it's legally an acceptable sum.** That's inappropriate.

[WIEDERHOLD'S COUNSEL]: Well, I think I can –

THE COURT: Overruled.

(Emphasis added).

Plaintiffs are allowed to ask for specific amounts, but not suggest that such amounts are legally acceptable or will withstand subsequent challenges. See, e.g., City Provisioners, Inc. v. Anderson, 578 So. 2d 855, 856 (Fla. 5th DCA 1991) (holding plaintiff's comment—"If you give him too much money, the judge can take away some of that money. It's to be-he can order remittitur or cut it down. If you don't give Mr. Anderson enough money, he can't order more money"—was improper statement of law and inappropriate attempt to shift responsibility for verdict from jury to judge). Because Mrs. Wiederhold's comment improperly suggested the $10 million amount would be upheld, it was not a proper subject of closing argument. See id. The trial court erred in overruling the objection.

### 3.    *Golden Rule and Personal Opinion.*

Finally, Domino's urges that we reverse based on the improper golden rule and personal opinion arguments made by Mrs. Wiederhold's attorney. At trial, after discussing the various versions of how the accident occurred, Mrs. Wiederhold's counsel commented about her decision to follow through with her plan to marry Mr. Wiederhold even after the accident.

[S]he fulfilled her promise and she married him and dedicated her life to taking care of him 24 hours a day, seven days a week, providing the care that he needed to keep him alive. **Listening to her testimony I hope you understand now why I told you in openings that I really stand in awe of her.** And I think hearing her story and what she did for her husband having to live through and deal with –

. . . .

**To live through and deal with what she did is why I am in awe. And how it makes many of us ask this question: Would we be able to do what she did?** I know she was faced with it. And when --

[DOMINO'S COUNSEL]: Excuse me, Judge. I have to approach.

THE COURT: **Sustained.**

[WIEDERHOLD'S COUNSEL]: **Makes me ask myself a question** --

[DOMINO'S COUNSEL]: Excuse me, Judge. **Personal belief of counsel.**

THE COURT: **Yes, sustained.**

[WIEDERHOLD'S COUNSEL]: And the worst of it, listening to her husband ask her to simply take his life. She couldn't do it because him dying -- with him dying, a part of her would die. It is a nightmare story. And they've taken that from her. That's why you must move a sum from their side of the courtroom to hers to pay her for what they took away from her, her husband, Richard Wiederhold . . . .

(Emphasis added). In its renewed motion for a new trial, Domino's objected that these arguments were not only the expression of counsel's personal beliefs, but also a violation of the golden rule. We agree that these arguments were improper golden rule and personal opinion arguments. See, e.g., SDG Dadeland Assocs. v. Anthony, 979 So. 2d 997, 1003 (Fla. 3d DCA 2008) (discussing improper golden rule and personal opinion arguments).

In sum, it was improper for Mrs. Wiederhold's counsel to suggest in closing argument that Domino's agency defense was a "greedy charade." That argument disparaged the manner in which Domino's defended this case—a type of argument that is unfailingly condemned by the courts. See Carnival Corp. v. Pajares, 972 So. 2d 973, 977 (Fla. 3d DCA 2007). It was also improper for Mrs. Wiederhold's counsel to advise the jury to "tell [Domino's] what you think" about its agency defense because doing so was clearly a "send a message" argument. See, e.g., Pineiro, 66 So. 3d at 1070; Grubbs, 762 So. 2d at 554. It was equally improper for Mrs. Wiederhold's counsel to argue that Domino's abandoned Mr. Kidd, when he knew full well it was not true. Similarly, Mrs. Wiederhold's attorney made improper golden rule and personal opinion arguments, which encouraged the jurors to decide the case on the basis of personal interest rather than on the evidence. See Metro. Dade Cty. v. Zapata, 601 So. 2d 239, 241 (Fla. 3d DCA 1992).

Even when viewed in context, these improper comments were numerous, leaving us to conclude that the argument was not designed to "prompt a 'logical analysis of the evidence in light of the applicable law.'" Intramed, Inc. v. Guider, 93 So. 3d 503, 507 (Fla. 4th DCA 2012) (quoting Murphy, 766 So. 2d at 1028). While only some of the comments were properly preserved for our review, in evaluating the errors, we consider "the cumulative effect" of both preserved and unpreserved error. Howard v. Palmer, 123 So. 3d 1171, 1174 (Fla. 4th DCA 2013). Having done so, we are unable to conclude that the errors, taken together, were harmless. See Linic v. State, 80 So. 3d 382, 393 (Fla. 4th DCA 2012) (holding "unpreserved error can be considered with the preserved error in order to evaluate whether the preserved error is harmless"). We, therefore, reverse the final judgment based on the improper closing argument.

**On Cross-Appeal**

On cross-appeal, Mrs. Wiederhold maintains that the estate should have been allowed to introduce all medical expenses paid on Mr. Wiederhold's behalf pursuant to section 768.21(6), Florida Statutes. That section states, in pertinent part:

> (6) The decedent's personal representative may recover for the decedent's estate the following:
>
> . . . .
>
> (b) Medical or funeral expenses due to the decedent's injury or death that have become a charge against her or his estate **or that were paid by or on behalf of decedent,** excluding amounts recoverable under subsection (5).

§ 768.21(6)(b), Fla. Stat. (2012) (emphasis added).

Mrs. Wiederhold claims that the estate was entitled to recover the $863,056.55 that Medicare and Cigna paid on Mr. Wiederhold's behalf, even though the estate later satisfied their liens for $51,612.49. Domino's disagrees, arguing that Mr. Wiederhold's estate is not entitled to windfall for medical expenses that were not owed by the estate and that had been resolved.

The estate has a right to claim medical expenses paid by or on Mr. Wiederhold's behalf. Id. § 768.21(6)(b); Horton v. Channing, 698 So. 2d 865, 869 (Fla. 1st DCA 1997) (determining that $425,824.42 paid by insurance providers constituted medical expenses paid on behalf of decedent, and therefore, constituted damages as provided by section 768.21(6)(b), despite fact that plaintiff and estate had no obligation to repay providers). Further, such damages are not subject to reduction when subrogation or reimbursement right exists. § 768.76(1), Fla. Stat. (2012); Sutton v. Ashcraft, 671 So. 2d 301, 303 (Fla. 5th DCA 1996). "The waiver or relinquishment of such rights does not destroy their

24

character." Sutton, 671 So. 2d at 303. "[I]t is the existence of such rights, not their exercise, which denies a tortfeasor the statutory right to a collateral source reduction." Id.; see Centex-Rodgers Constr. Co. v. Herrera, 816 So. 2d 1206, 1207 (Fla. 4th DCA 2002) (following Sutton, and noting that disability carrier's release or waiver of its subrogation rights, pursuant to negotiated settlement, does not destroy character of disability payments). In other words, Domino's cannot escape liability for medical expenses paid on Mr. Wiederhold's behalf because she settled those claims. As this Court has explained:

> It may seem unfair that, by virtue of a contractual arrangement with the insurance carrier, the survivors received substantially more than their stipulated damages and that the defendants are required to pay the full amount of damages even though part of those damages had been paid. On the other hand, plaintiffs' counsel was ingenious in inducing Allstate, in return for a $95,000 discount on the face amount of the UM coverage, to surrender its subrogation rights and the opportunity to pursue and settle a claim of speculative value. There is no reason that ingenuity should accrue to the benefit of the tortfeasors. Walker v. Hilliard, 329 So. 2d 44 (Fla. 1st DCA 1976). The principle behind the collateral source rule is that it is better for the wronged plaintiff to receive a potential windfall than for a tortfeasor to be relieved of responsibility for the wrong.

Respess v. Carter, 585 So. 2d 987, 990 (Fla. 5th DCA 1991). Based on the plain wording of section 768.21(6)(b), we conclude the trial court erred in prohibiting Mrs. Wiederhold from seeking compensation for medical expenses paid on Mr. Wiederhold's behalf.[7]

## CONCLUSION

We affirm the denial of directed verdicts on Mrs. Wiederhold's status as a "surviving spouse" and on Domino's vicarious liability, and the portion of the judgment

---

[7] For that reason, we reject Mrs. Wiederhold's alternative argument that she should be entitled to present all of Mr. Wiederhold's medical bills to the jury regardless of whether they were paid on Mr. Wiederhold's behalf.

related to economic damages for home improvements, which was not contested on appeal. We reverse and remand for a new trial on liability and damages as a result of Mrs. Wiederhold's improper closing argument. On the cross-appeal, we reverse and direct that on re-trial, all medical expenses paid on Mr. Wiederhold's account are compensable. We also certify express and direct conflict with Kelly.

AFFIRMED in part; REVERSED in part; REMANDED; CONFLICT CERTIFIED.

COHEN, C.J. and WALLIS, J., concur.